Guardianship in socage was a consequence of socage tenure, and dependent upon the existence of that tenure. Where there is no such tenure, there is no such guardianship, strictly speaking; though it may be very proper to pay some attention to the rule in the appointment of guardians, as it is calculated to prevent the orphan from falling into hands where he could not with safety be trusted. In like manner, as where the ancestor died seized of an inheritance that lay not *Page 244 
in tenure, it is held, as a rule, that the next of kin to whom the inheritance cannot descend should have the custody of him, Co. Litt., 87, b. As all our lands are now allodial, the rules cited at the bar on either side are not strictly obligatory on the Court. The act of 1762, concerning the management of orphans and their estates, was passed at a time when the lands of this country were held by socage tenure, and from thence that act may be supposed to have been framed with a view to the rules relative to guardianship in socage. That supposition will vanish if it be considered in how many material points the guardianship established by that act differs from the guardianship in socage. The guardianship in socage needed not the appointment of any court; the person entitled to be guardian was as precisely marked out by law, and as well entitled by it, as the heir at law himself. Where there were two or more in equal degree of kindred, to whom the inheritance could not (306) descend, the law gave a rule of decision not by saying they should apply to a court for the appointment of the one or the other, but by saying that he who could first get possession of the heir should have the guardianship of him. When the ancestor died seized of lands, part of which descended on the orphan's death to relations on the father's side, and part to relations on the mother's side, in that case, although the heir must fall into the possession of some person liable to the temptation meant to be avoided by the rule, no court was called upon to appoint a guardian not liable to that objection, but such of the next of kin as could first get possession of the heir should have the custody of his person, and the kindred on either side might enter as guardian on the possession of the lands that could not descend to them. Co. Litt., 88, a and b. This proves that the guardian in socage derived his appointment and authority from the law immediately, without the intervention of a court; and he might enter immediately on the death of the ancestor upon the lands descended to the orphan, and also might immediately take possession of the ward; but the act of 1762 manifestly intended that no person should interfered with either but in consequence of the appointment of the county or Superior Court; and that no person should receive the appointment unless he gave security as the act requires. This was a circumstance not required in the socage guardianship. If the act had intended that a person designated by law should be entitled to the guardianship, it would have been useless to have vested the power of appointing him in the county or Superior Court; their appointment of a person already appointed by law would be at least a redundant if not an absurd act. The socage guardian could not interfere with any part of the ward's property but his lands held by socage tenure, not with his copyhold lands and the like, and not with any part of his personal estate; *Page 245 
by this act he is entrusted with the whole estate of his ward of every kind. In England it was usual for the ordinary to appoint a guardian over the body and personal estate where there was no land held by socage tenure. Wood's Inst., 68; L. Ray., 1334. The act of 1762 consolidates the guardianship of the body, lands and personal estate, and vests the appointment of a proper guardian in the county or Superior Court. When personal property came to be considerable in England, the inconvenience of the guardianship in socage began to be felt, and was attempted to be remedied by the act of 12 Car. II., ch. 24, allowing parents to appoint guardians to their children till 21. These testamentary guardians did not lose their authority by the ward's arrival to the age of 14 years, nor could they be displaced by the ward's (307) choosing another guardian at that age. These were some of the inconveniences experienced under the former law. Orphans of the tender age of 14 oftentimes made imprudent choices of guardians. These testamentary guardians, however, like others, were liable to be removed by chancery, after the abolition of the Court of Wards in the beginning of the reign of Charles II., for misbehavior in their trust, or for giving room to suspect they were about to marry their wards in disparagement. The act of 1762 adopts the same provisions amongst its first clauses, from whence there is reason to believe the Legislature were actuated by the same motives as the framers of the act of Charles. The act of 1762 evidently contemplates that the guardianship committed by the court should be of the same duration as that made by the appointment of a parent, namely, to the age of 21; for sections 11, 12, and 13 give directions about preserving the estates of orphans, and leasing out their lands till they arrive to the age of 21. This act, therefore, cannot have a regard to the old law relating to guardianship, but meant to alter it entirely. It gives the court power to appoint, till the ward come to age, such person as they may think proper to be his guardian, with authority to remove him whenever he misbehaves in the trust they have committed to him. This is a much more effectual mode of procuring proper guardians, and of keeping them steadily to their duty, than if the court were obliged to appoint the next of kin to whom the inheritance could not descend, who in numerous instances might be very unfit persons. As the Court have a discretional power of choosing the most proper person, they should make their election of that person who can best attend to the affairs of the orphan and whom they have reason to believe will attend to them with the greatest advantage and most fidelity to the orphan. Mr. McAllister is stated to live at the distance of 400 or 500 miles, in another State. Should he be appointed, he must either carry the ward with him to his place of residence, where the court cannot from *Page 246 
time to time be informed of his treatment, or he must leave the ward in the possession of some agent, instead of attending to the charge of his education himself. Add to this that the estate of the ward must (308) in like manner be committed to the management of an agent, or be greatly neglected. Mr. Mills resides on the spot, near to the orphan's estate, and in the county where it lies. Should he mismanage either with respect to the person or estate of the ward, intelligence may immediately be conveyed to the court, and his misbehavior corrected. Mr. Mills has no prospect of ever succeeding to the ward's estate, whereas Mr. McAllister has; and though this is not a consideration absolutely obligatory in the court, they will not entirely disregard it. Though they may appoint whoever they think most proper, even the next of kin in the immediate line of succession, they will not out of prudence do this where the estate is large, and any other person equally as well qualified offers or can be procured to take the guardianship upon himself. The Court of Chancery in England always governs its discretion by this consideration, among others, though the contrary was once avowed in the case of an application by Justice Dormer. There is also another circumstance in the present case which hath been mentioned at the bar, and is not denied, that ought to have great weight. It is stated that Mr. McAllister claims part of this very estate, the wardship of which he is now seeking. It is said in avoidance of this objection that the orphan upon his arrival at 14 years may choose another guardian, and call him to account for the profits; but if we appoint Mr. McAllister, he will be entitled to the custody of the evidences of the plaintiff's title to this estate; and shall we give the custody of these evidences to the man whose interest it is, and who is so much concerned to suppress and conceal them? Surely, the Court would act a very imprudent part to do so. Wherefore, let Mr. Mills be appointed; and he was appointed accordingly, and gave bond and sureties as the act requires.
Cited: Grant v. Whitaker, 5 N.C. 232.